D9241 – H34

# IN THE COURT OF COMMON PLEAS
## OF FRANKLIN COUNTY, OHIO

MA EQUIPMENT LEASING I LLC,
915 Wilshire Blvd., Suite 1750
Los Angeles, California  90017,

  and

MA 265 NORTH HAMILTON ROAD LLC
265 North Hamilton Road
Columbus, Ohio  43213-1332,

    Plaintiffs,

  vs.

LYNN TILTON
3575 South Ocean Boulevard
Highland Beach, Florida  33487,

  and

PATRIARCH PARTNERS, LLC
32 Avenue of the Americas, 17th Floor
New York, New York  10013,

  and

PATRIARCH PARTNERS MANAGEMENT
GROUP, LLC
4055 Valley View Lane, Suite 500
Dallas, Texas  75244,

  and

JOHN HARRINGTON
10 Kingsbury Street
Needham, Massachusetts  02492,

  and

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

**09CVH 08 12912**

Case No. _____

Judge _____

**JURY DEMAND ENDORSED
HEREON**



FILED
COURT OF COMMON PLEAS

AUG 25 2009

Franklin County, Ohio
CLERK OF COURTS



D9241 - H35

ZOHAR II 2005-1, LIMITED      :
32 Avenue of the Americas      :
New York, New York 10013,     :
                                            :
     and                            :
                                            :
JOHN DOE DEFENDANTS 1-10     :
Addresses unknown,           :
                                            :
           Defendants.       :

## COMPLAINT

### PARTIES

1.    Plaintiff MA Equipment Leasing I LLC ("Plaintiff MA Equipment") is a Delaware limited liability company with its principal place of business at 915 Wilshire Boulevard., Suite 1750, Los Angeles, California 90017. Plaintiff MA Equipment is a private investment firm engaged in the business of leasing industrial equipment.

2.    Plaintiff MA 265 North Hamilton Road LLC ("Plaintiff MA 265") is an Ohio limited liability company with its principal place of business at 265 North Hamilton Road, Columbus, Ohio 43213-1332. Plaintiff MA 265 is a private real estate investment firm specializing in the leasing of quality industrial real estate.

3.    Defendant Lynn Tilton ("Tilton") is the Chief Executive Officer, founder and, upon information and belief, majority shareholder in Patriarch Partners, Patriarch Management and Zohar II (each as defined herein). Tilton purports to be a citizen of Florida.

4.    Defendant Patriarch Partners, LLC ("Patriarch Partners") is a Delaware limited liability company with its principal place of business in New York, New York. Patriarch Partners is, or manages, what is commonly-known as a "vulture fund," meaning it is

2

D9241 – H36

an investment firm that specializes in identifying and attempting to turn around financially-distressed companies. Patriarch Partners frequently boasts that the investment funds that Patriarch Partners manages hold assets in excess of $6 billion and include majority and minority ownership positions in more than 70 companies.

5.     Patriarch Partners Management Group, LLC ("Patriarch Management") is, upon information and belief, a Florida limited liability company with its principal place of business in Dallas, Texas. Patriarch Management is an affiliate of Patriarch Partners and, upon information and belief, is owned and controlled by Patriarch Partners. Lynn Tilton and Patriarch Partners use Patriarch Management to directly supervise and oversee the operations of the companies in its so-called investment "platforms" by, among other things, placing its employees in key executive positions, such as CEO or CFO, so that Patriarch Management can effectively run the companies that Patriarch Partners owns.

6.     Defendant John Harrington ("Harrington") is a Managing Director and employee of Patriarch Management and, as such, also serves as an agent of Patriarch Partners. Upon information and belief, Harrington is responsible for the management of Patriarch Partners' "Engineering and Manufacturing Platform." Harrington purports to be a citizen of Massachusetts.

7.     Zohar II 2005-1, Limited ("Zohar II") was, upon information and belief, created by Lynn Tilton to invest in, own and finance Zohar Waterworks, LLC d/b/a Tri-Palm International ("Zohar Waterworks"). Upon information and belief, Zohar II is the sole member of Zohar Waterworks. Zohar II is a Delaware limited liability company with its principal place of business in New York, New York.

3

D9241 – H37

8.     John Does 1 through 10 are entities under the control of and/or affiliates of Patriarch Partners, Patriarch Management and Zohar II and/or may have some relationship with Tilton, Zohar Waterworks, Zohar II, Patriarch Partners, Patriarch Management and/or Harrington, and which shared in the management, control and/or financing of Zohar Waterworks.

## INTRODUCTION

9.     This case arises from various disputes between Plaintiffs MA Equipment and MA 265 (together, "Plaintiffs") and a company that Defendants Tilton, Patriarch Partners, Patriarch Management, Zohar II and Harrington (collectively, "Defendants") owned and/or dominated called Zohar Waterworks.  Plaintiffs were forced to commence litigation against Zohar Waterworks when Defendants directed Zohar Waterworks to literally attempt to steal Plaintiffs' equipment and machinery under the cover of darkness to Mexico, in the belief that the equipment and machinery would be beyond the jurisdiction of any U.S. court.  Caught red-handed during the course of a temporary restraining order conference before this Court, Zohar Waterworks was ordered by this Court to return that equipment before it reached the Mexican border.

10.     As explained below, Tilton and Patriarch Partners' control of Zohar Waterworks was so absolute, pervasive and complete that they not only made all key decisions regarding the management, control and operations of Zohar Waterworks, including, but not limited to, the hiring and firing of its CEO and other corporate officers, but they also personally oversaw and managed Zohar's "scorched earth" litigation defense in the litigation between Plaintiffs and Zohar Waterworks styled as *MA Equipment Leasing  I LLC and MA*

4

D9241 - H38

*265 North Hamilton Road LLC v. Zohar Waterworks, LLC*, Case No. 07 CVH 2297, in the Franklin County Court of Common Pleas, Ohio. That strategy, which Defendants will again no doubt employ here, was so recognized by two judicial officers when they awarded over $940,000 in attorneys' fees and costs against Zohar Waterworks for implementing such unnecessary and disingenuous litigation tactics.

11.    Indeed, when a judgment for damages in the amount of approximately $5,740,000 was on the verge of being issued in April 2009, Tilton, Harrington, Patriarch Management, Zohar II and Patriarch Partners elected to take Zohar Waterworks into bankruptcy to thwart the judgment and avoid liability for their respective conduct.   As demonstrated below, the unlawful conduct of Defendants Tilton, Harrington, Patriarch Partners, Patriarch Management, Zohar II and other Patriarch entities – unlawful conduct which includes fraud, deceit, conversion, theft, threats and economic duress – directly and proximately caused the damages suffered by Plaintiffs. As those parties have recently played puppeteer and actually orchestrated the bankruptcy of Zohar Waterworks to avoid this Court's earlier awards and judgments, Plaintiffs are now forced to commence this action to compel these parties to account for their unlawful, tortious and fraudulent conduct.

### FACTUAL BACKGROUND

12.    In or around February 2005, Plaintiffs MA 265, MA Equipment, and certain of their affiliates entered into a series of transactions with a company named Oasis Corporation ("Oasis"). At that time, Oasis was a manufacturer of water cooler and water bottling products.   In connection with those transactions, MA 265 purchased from and leased back to Oasis the real estate which consisted of the corporate headquarters and

5

D9241 — H39

manufacturing facility that Oasis had previously owned and used in Columbus, Ohio (the "Premises.") Likewise, in connection with those transactions, MA Equipment and Oasis entered into an Equipment Purchase Agreement whereby MA Equipment purchased the equipment and machinery of Oasis (the "Equipment") and agreed to lease that Equipment back to Oasis.

13.    In or about June 2005, Oasis began to entertain offers to sell its business. In connection with that effort, Oasis' then CEO, Chris Gurreri ("Gurreri"), had conversations with Tilton about the possibility of Patriarch Partners and its affiliates acquiring the operations and certain assets of Oasis.

14.    In July and August 2005, Tilton and other Patriarch Partners representatives visited Oasis' operation in Columbus, Ohio to meet with Gurreri and other representatives of Oasis about possibly purchasing Oasis' operations and assets and to conduct initial due diligence in connection with the purchase of those assets.

I.    **Tilton, Patriarch Partners and Zohar II's Creation, Control and Domination of Zohar Waterworks**

15.    As noted previously, Patriarch Partners is, or manages, what is commonly known as a "vulture fund." Vulture funds such as Patriarch Partners specialize in identifying, acquiring and/or investing in the operations and assets of distressed companies. Their modus operandi is to replace management with their own team including, but not limited to, Tilton, to cut expenses and personnel at all costs. Although Tilton, Patriarch Partners and Zohar II use a number of different corporate entities to manage and finance the operations of their acquisitions, at the end of the day those entities are under the complete control of and managed formally and/or informally by Tilton or Patriarch Partners.

6

D9241 - H40

16.    In connection with their acquisition of the distressed company's assets and operations, Tilton and Patriarch Partners ensure that they have absolute control over the management team.  To the extent that Tilton is unhappy with some or all of the existing management of the company whose assets it is acquiring, Tilton and/or Patriarch Partners will replace those portions of that existing management team with employees of their affiliate Patriarch Management, or trusted consultants, so that Tilton and/or one of her related entities have absolute control over the operations of that business.

17.    In early August 2005, Tilton and Patriarch Partners began negotiating the sale of Oasis' assets and operations so that they could conclude that sale by August 26, 2005.

18.    At that same time, Patriarch Partners, Zohar II and Tilton caused the creation of Zohar Waterworks, which they initially identified as "Newco," for the purpose of purchasing Oasis' assets in an Article 9 transaction that would accomplish the sale of Oasis' assets.  "Newco" was later officially renamed "Zohar Waterworks LLC" and did business as "Tri Palm International, LLC."   Zohar Waterworks was a wholly owned affiliate of Patriarch Partners and Zohar II, which when the layers are in turn peeled away, was owned, managed and dominated by Tilton.  To echo the sworn statement of a former officer of Zohar Waterworks, "nothing is done without Lynn Tilton's approval."

19.    On or about August 18, 2005, Tilton and Patriarch Partners individually hired Oasis' CEO, Chris Gurreri, to serve as Zohar Waterworks' CEO and President and to facilitate their purchase of Oasis' assets.

D9241 - H41

II. **Tilton's and Patriarch Partners' Negotiation of the Building Leases and the Equipment Lease**

20. During their due diligence of the Oasis operations, Tilton and Patriarch Partners learned that Plaintiffs owned the Premises and Equipment being used by Oasis.

21. Knowing that any investment in Zohar Waterworks would not succeed without the immediate use of the Premises and Equipment, Tilton and Patriarch Partners sought to negotiate leases similar to the ones that Oasis formerly had with Plaintiffs for the use of the Premises and Equipment.

22. To that end, in or about August 2005, Tilton and two other Patriarch Partners representatives, Robert Annas and Douglas Combs, traveled to Columbus, Ohio to negotiate leases for the Premises and Equipment that their new business, Zohar Waterworks, would operate.

23. During the course of those negotiations in Columbus, Ohio with Plaintiffs to negotiate the terms and conditions of Zohar Waterworks' leases, Tilton, on behalf of Zohar Waterworks, demanded that Plaintiffs would have to agree to reduce the term of the equipment lease from the then-current multi-year lease agreement that Plaintiff MA Equipment had with Oasis for the use of the equipment utilized in the business of making water coolers to a one (1) year lease with a one (1) year option. Likewise, Tilton insisted that the leases for the Premises be substantially shortened or she would not allow the transaction to close.

24. Tilton and/or Patriarch Partners hired and retained counsel for Zohar Waterworks. Upon information and belief, Zohar II, an entity created by Tilton and/or Patriarch Partners, funded the engagement and payment of counsel for Zohar Waterworks.

8

D9241 - H42

25.    Zohar Waterworks had no role in the negotiation of the Equipment Lease or the Building Leases, as its CEO and only employee, Gurreri, was not copied on any emails bearing drafts of those documents and never saw, read or reviewed those documents prior to signing them. Rather, Tilton, through Patriarch Partners and other agents under her control, negotiated these Leases. Indeed, the Leases were originally prepared for execution by Tilton as an agent of Zohar II, and not by Gurreri.

26.    Upon information and belief, during the course of the due diligence of Oasis' operations and their analysis of the finances of the potential new business, Tilton and Patriarch Partners determined that they would consolidate the North American operations of Zohar Waterworks to Monterrey, Mexico and that they would ultimately terminate the leases that they were negotiating with Plaintiff MA 265. Similarly, at this time, Tilton and Patriarch Partners determined that they would need to move the Zohar Waterworks Equipment from the Columbus operations to its Mexican facility to complete that consolidation.

27.    When Tilton and Patriarch Partners negotiated the leases for the Premises, they were fully aware of the poor condition of the Premises. Indeed, Tilton and her advisors toured the facility and personally observed the poor condition of the Premises. The problems were obvious, substantial and numerous. For example, dozens of tarps were strung throughout the ceiling of the manufacturing operations to catch water from the leaking roof. These tarps were in turn connected by hoses to deposit water from the leaking roof to 55 gallon drums which were emptied when they became full. The damage from the water pouring into the building was obvious and noted by Tilton and Patriarch Partners, as well as

D9241 - H43

by Gurreri, the former Oasis CEO that Tilton hand-picked to run Zohar Waterworks as its CEO.

28.    During the course of the negotiations, Tilton and Patriarch Partners agreed on behalf of Zohar Waterworks that Zohar Waterworks would assume full responsibility for the repair and maintenance of the Premises during the Leases' term and, most importantly, at the conclusion of the Building Leases.  In this and in the commercial lease context, a lease which requires a commercial tenant to assume full responsibility for the repair, maintenance and replacement of a commercial property is commonly known as a "net" or "triple net" lease.

29.    As sophisticated commercial parties, Tilton and Patriarch Partners were familiar with the concept of a "net" or "triple net" lease.  Indeed, upon information and belief, in connection with their acquisition of and/or investment in other companies on other occasions, Tilton and Patriarch Partners had come across or negotiated these types of commercial leases before.

30.    In addition, during the course of negotiations, Tilton and Patriarch Partners were advised and understood that the Equipment Lease prohibited removal of the Equipment that was owned by Plaintiff MA Equipment from the Columbus facility without Plaintiff MA Equipment's prior written consent.

31.    Despite these contractual obligations within the respective Leases and their full knowledge that Zohar Waterworks would not honor those provisions in light of the plans to move the operations to Mexico, Tilton and Patriarch Partners nevertheless authorized and directed the CEO of Zohar Waterworks to execute the Leases.  Simply put, at the time they negotiated these Leases, Tilton and Patriarch Partners had no intention whatsoever of

10

D9241 - H44

permitting Zohar Waterworks to comply with and abide by the terms of the Leases as they related to the maintenance and repair of the Premises and as to the movement of Plaintiffs' Equipment.

32.     On August 26, 2005, Zohar Waterworks' CEO, Gurreri, received direction from Tilton and/or Patriarch Partners to sign the Equipment Lease and the Building Leases. (Copies of the Leases are attached hereto as Exhibits A, B and C).

**III.     Defendants' Interference with the Equipment Lease**

33.     In March 2006, Zohar Waterworks announced its intention to close its manufacturing operations in Columbus and transfer those operations to a facility in Monterrey, Mexico.

34.     Thereafter, without any advance written consent from the owner of the Equipment, Plaintiff MA Equipment, and in complete violation of its lease, at the direction of Tilton and Patriarch, Zohar Waterworks covertly began transporting the Equipment owned by Plaintiff MA Equipment to its Mexican facility.

35.     In or around June 2006, due to their dissatisfaction with the financial performance of Zohar Waterworks and the current CEO Gurreri, Tilton, Patriarch Partners, Zohar II and Patriarch Management assigned Harrington to evaluate Zohar Waterworks' operations and undertake any necessary changes to stop Zohar Waterworks from "bleeding cash."

36.     At the same time, Tilton advised Gurreri that the financial performance of Zohar Waterworks would have to improve significantly or he would be terminated.

11

D9241 – H45

37.   In or around November 2006, as Zohar Waterworks' financial performance continued to plummet, Gurreri resigned before Tilton and Patriarch Partners could terminate him.

38.   In December 2006, Harrington began serving his first term as an "interim" CEO of Zohar Waterworks.  While serving in this position, Harrington remained an employee of Patriarch Management and was an agent of Tilton, Patriarch Partners and Zohar II at all relevant times.  Although he was serving as an interim CEO of Zohar Waterworks, his allegiance was indisputably to Tilton, Patriarch Partners, Patriarch Management and Zohar II and at all relevant times, he received all orders and instructions from them.

39.   In December 2006, Plaintiff MA Equipment entered into negotiations with several auction companies to sell Equipment unused by Zohar Waterworks, after having secured releases from Zohar Waterworks in October 2006 to sell all remaining Equipment in the Columbus facility.

40.   In early January 2007, Plaintiff MA Equipment confirmed with Zohar Waterworks and Harrington that it could sell the unused Equipment, pursuant to the Equipment Lease, at an auction that was to occur in February 2007 and, relying on that assent, entered into a contract to auction that unused Equipment.

41.   At this time, Harrington came to realize that Zohar Waterworks had significant financial exposure under the Building Leases.  The month before, on or about December 15, 2006, Harrington had received a letter from Plaintiff MA 265's counsel advising him that Zohar Waterworks would be responsible for substantial repairs in excess of $4,000,000 for the Premises.  After reviewing the Building Leases and after conferring with

12

D9241 - H46

Tilton, Patriarch Partners and counsel, Harrington concluded that Zohar Waterworks would in fact be responsible for those repairs and the restoration of the Premises under the Building Leases.

42. In addition, Harrington concluded there were other terms in the Building Leases and the Equipment Lease that he considered unfavorable to Zohar Waterworks. For example, Harrington concluded that Zohar Waterworks was paying more than it should for utilities under the Building Leases and that, under the Equipment Lease, it would still be paying rent for the unused Equipment to be sold at the upcoming auction.

43. In January 2007, Harrington specifically reviewed the Equipment Lease and learned that Zohar Waterworks would be obliged under Paragraph 25 of the Equipment Lease to pay Plaintiff MA Equipment almost $3,600,000 (subject to any reductions from the auction) to purchase the Equipment critical to its operations. As some of that Equipment was in poor condition, Harrington concluded that this provision of the Equipment Lease was not advantageous to the financial interests of Tilton and Patriarch Partners. Indeed, in the previous litigation, Harrington boasted that he would not have signed the Equipment Lease had it been presented to him.

44. In connection with his review of the Equipment Lease, Harrington reviewed Paragraph 26 of the Equipment Lease. Paragraph 26 specifically addressed the sale of unused Equipment and imposed upon Zohar Waterworks the duty to "reasonably cooperate" in connection with any sale or auction of that unused Equipment.

45. In late January 2007, at the same time that Harrington had reviewed the Equipment Lease and the Building Leases and learned that there were terms that he deemed

13

D9241 – H47

unfavorable to Zohar Waterworks, Zohar Waterworks decided it now wished to keep certain Equipment that it had previously advised MA Equipment was available for sale.

46.    Zohar Waterworks advised Harrington that Zohar Waterworks would need this Equipment and provided Harrington with a list identifying this Equipment in late January 2007.

47.    Harrington, both personally and as an agent of Tilton, Patriarch Partners, Patriarch Management and Zohar II, now saw an opening to coerce Plaintiffs into renegotiating the terms of the Building Leases and Equipment Lease.

A.    **Harrington Threatens to "Blow Up" the Auction And Unlawfully Attempts to Remove Plaintiff's Equipment To Mexico**

48.    As the February 20, 2007 auction approached, a series of conference calls were held on Thursday, February 8, 2007, between representatives of Plaintiff MA Equipment, the auctioneer retained to sell the unused Equipment, and Zohar Waterworks. The purpose of those conference calls was to finalize certain issues regarding the auction, including the final determination of what, if any, additional Equipment Zohar Waterworks wanted to be removed from the auction.

49.    At this time, Harrington was aware that the auction was scheduled to begin Tuesday, February 20, 2007, as advertisements and brochures promoting the auction had been circulated throughout the United States. Indeed, Harrington was also aware that the Equipment that Zohar Waterworks belatedly wished to keep was now featured prominently in certain of those brochures, with some of that Equipment even on the cover of those brochures. Finally, Harrington was also aware that Plaintiff MA Equipment had entered into a contract to sell the unused Equipment to the auctioneer.

14

50.     Although the conference calls were to address the upcoming auction, Harrington instead took the opportunity to aggressively insert his objections to the Building Leases and try to extract concessions from Plaintiffs MA Equipment and MA 265.  For example, during one of the calls, Harrington claimed that Plaintiff MA 265 was overcharging Zohar Waterworks on utilities, he claimed that Zohar Waterworks was paying too much for maintenance costs, and he claimed that Zohar Waterworks did not receive the benefit for the space that Plaintiff MA 265 was leasing to another tenant.  Not surprisingly, Harrington's claims ran counter to the terms of the Building Leases and the parties' practice over the past 18 months.

51.     During that call, Harrington repeatedly threatened that he was "going to blow up the auction" if Plaintiff MA Equipment did not accede to his changes in the Building Leases.  Similarly, Harrington also threatened during one of those calls to "lock out" the auctioneers and any bidders arriving to bid on the Equipment.

52.     In addition, Harrington raised a number of terms in the Equipment Lease and the Building Leases with which he took exception, including, but not limited to, the fact that Zohar Waterworks would not continue to pay rent on Equipment sold in the auction. Harrington also specifically tied the issue of a lease payment reduction under the Building Leases to the upcoming auction and advised Casey Adams, Plaintiffs' representative, that the auction would not go forward unless the Building Leases' issues were resolved favorably to Zohar Waterworks.

53.     Remarkably, at the time of this call with Plaintiff MA Equipment, Harrington had in his possession the list identifying the Equipment that Zohar Waterworks purportedly

15

D9241 - H49

needed in Mexico to continue operating. Yet, despite the fact that one of the purposes of the conference calls was to identify that Equipment, Harrington never advised Mr. Adams of the Equipment on that list, or that a list of that Equipment even existed.

54.     At the end of that call, and unbeknownst to Plaintiff MA Equipment, Harrington decided to "up the ante" and he instructed Zohar Waterworks immediately to undertake efforts to improperly remove and transport to Mexico the Equipment that Zohar Waterworks had failed to identify. Again, this was done without the knowledge or the prior written consent of Plaintiff MA Equipment, as required under Paragraph 8 of the Equipment Lease.

55.     Over the course of the next week, Harrington continued to insist that Plaintiffs MA Equipment and MA 265 renegotiate their respective Leases as a condition of the auction going forward.

56.     In connection with that effort and to create more pressure on Plaintiffs to bend to his demands, Harrington deceived Plaintiff MA Equipment about a number of material matters. For example, Harrington misrepresented to Plaintiffs a conversation with one of the auctioneers, a conversation in which Harrington claimed that he had notified that auctioneer that the auction would not go forward.     In the earlier litigation, Harrington admitted that this conversation never took place and that he was not being truthful with Plaintiffs about the types of communications Harrington was having with the auctioneers.

57.     Likewise, despite repeated requests from Plaintiff MA Equipment that he identify the Equipment that he claimed Zohar Waterworks needed, Harrington refused to disclose the Equipment that Zohar Waterworks purported to need, let alone the fact that he

16

D9241 - H50

had a list of that Equipment or that he had directed that such Equipment be transported to Mexico.

**B.   The Litigation Regarding the Equipment Lease**

58.     In light of the threats, deceit and other unlawful misconduct of Harrington, MA Equipment sought this Court's assistance to compel Zohar Waterworks' cooperation with the auction. That case, captioned *MA Equipment Leasing I LLC, et al. v. Zohar Waterworks LLC,* Case No. 07 CVH 02 2297 was ultimately assigned to the Honorable Judge John Bessey. On Friday, February 16, 2007, MA Equipment filed a request for a temporary restraining order (TRO) to ensure that the auction went forward. During the course of the TRO, MA Equipment discovered for the first time that Zohar Waterworks had improperly removed Equipment to be sold at the auction from the Columbus facility and that the Equipment was on trucks speeding to Zohar Waterworks' facility in Mexico.

59.     After conferences throughout the morning and afternoon of Friday, February 16, 2007, the Honorable David Cain issued a Temporary Restraining Order, directing Zohar Waterworks to return the Equipment to the Columbus facility for the auction. The trucks carrying the Equipment were turned around in Texas only as a result of this Court's order.

60.     On February 16, 2007, due to the unlawful conduct of Harrington, Plaintiff MA Equipment terminated the Equipment Lease and undertook proceedings to secure the repossession of its Equipment.

61.     On April 17, 2007 a Preliminary Injunction hearing was commenced. During that hearing, Plaintiff MA Equipment and Zohar Waterworks entered into a partial settlement whereby Zohar Waterworks purchased all of the Equipment from Plaintiff MA

D9241 - H51

Equipment. The funding for that settlement was provided by Patriarch Partners and Zohar II at the direction of Tilton.

62.    In September 2008, after hearing the testimony of witnesses and the presentation of other evidence, Judge Bessey found that Zohar Waterworks had materially breached the Equipment Lease, that Harrington had been responsible for those breaches, and that Plaintiff MA Equipment was entitled to its attorneys' fees as a result of those breaches.

63.    In February 2009, after considering evidence and testimony, Magistrate Timothy Harildstadt awarded approximately $591,000 in reasonable attorneys' fees and costs to Plaintiff MA Equipment.

## IV.    Defendants' Interference with the Building Leases

64.    Under Paragraphs 7.1(a) and 7.1(b) of the Building Leases, Zohar Waterworks was required to maintain the Premises, Utility Installations, and Alterations in good order, condition and repair, and for procuring and maintaining service contracts for maintenance and improvements installed on the Premises.

65.    Under Paragraph 7.6 of the Building Leases, Zohar Waterworks was required to provide Plaintiff MA 265 with certificates every year certifying that the Premises (i) are in good and safe condition and repair, and (ii) are and have been maintained in good order, repair and conditions consistent with maintenance procedures and standards which would generally be applied by commercially reasonable operators.

66.    Under Paragraph 7.4(c) of the Building Leases, Zohar Waterworks was required to "surrender the Premises" "in good operating order, condition and state of repair."

18

D9241 — H52

67.     As noted previously, one of the most substantial problems with the Premises was the poor condition of its roof. Under the unambiguous language of Paragraphs 7.1(a) and 7.2 of the Building Leases, Zohar Waterworks (as Lessee) was responsible for the repair and maintenance of the Premises, including the roof, and Plaintiff MA 265 (as Lessor) had "no obligation, in any manner whatsoever, to repair, maintain or replace all or any portion of the Premises . . . ."

68.     The poor condition of the roof was common knowledge and visible to all who visited the Premises. Indeed, Zohar Waterworks' own maintenance manager conceded that the roof "was deteriorating rapidly" because "you couldn't stop the water" and the "water accelerates" the decline of the roof. The tarps and barrels used to route the water leaking through the roofs were used continuously throughout Zohar Waterworks' tenancy at the Premises. Zohar Waterworks only stopped using this mechanism when the local fire department ordered the tarps removed because they posed a fire hazard by potentially interfering with the operation of the Premises' fire sprinklers.

69.     At all times, Zohar Waterworks was fully aware of its responsibility for the Premises. For example, immediately after execution of the Building Leases, Zohar Waterworks secured numerous bids for the replacement of portions of the roof at the direction of Plaintiff MA 265 and throughout its tenancy, Zohar Waterworks patched holes in the roof, instead of demanding that Plaintiffs do so.

70.     Despite its clear obligation to do so, Zohar Waterworks failed to undertake the necessary repair and maintenance obligations imposed upon it under the Building Leases.

19

D9241 – H53

71.     As a result, on or about December 15, 2006, Plaintiff MA 265 sent a certified letter to Harrington advising him of Zohar Waterworks' failure to comply with the Building Leases and advised him that consultants who had recently evaluated the Premises had concluded that it would cost in excess of $4,000,000 to repair and restore the Premises to the requisite good operating order, condition and state of repair.

72.     After reviewing the Building Leases and after consulting with counsel and the other Defendants, upon information and belief, Harrington concluded that Zohar Waterworks was in fact obligated to repair and restore the Premises under the Building Leases.

73.     Notwithstanding that knowledge, Harrington consulted with Tilton and, upon information and belief, both decided that Harrington would direct Zohar Waterworks not to comply with its obligations under the Building Leases to repair and restore the Premises to the requisite "good operating order, condition and state of repair" required under Paragraphs 7.1(a) and (b) of the Building Leases.

74.     Indeed, when Zohar Waterworks' Operations Director, Paul Bedell, approached Harrington on whether he should undertake such repairs, Harrington told him he was not to perform any repairs until the litigation between Plaintiffs and Zohar Waterworks was over – an order, from Tilton and Patriarch Partners as well as Harrington, that effectively meant that Zohar Waterworks was to ignore its clear obligations under the Building Leases and to do nothing to repair the Premises.

75.     When it became clear that Tilton, Patriarch Partners and Harrington remained unwilling to direct Zohar Waterworks to repair and restore the Premises, Plaintiff MA 265

D9241 - H54

moved for summary judgment for a finding that Zohar Waterworks was responsible for the repair and maintenance of the Premises under the Building Leases.

76.     On or about December 4, 2007, Judge Bessey granted summary judgment in favor of Plaintiff MA 265 and found that Zohar Waterworks had materially breached its obligations to repair and maintain the Premises under the Building Leases.

77.     In April and May 2008, a trial was held to determine the extent of Plaintiff MA 265's damages arising from Zohar Waterworks' failure to perform under the Building Leases. In May 2009, Judge Bessey found that Plaintiff MA 265 had been damaged in excess of $5,740,000.

## V.     Defendants' Domination and Control of Zohar Waterworks

78.     As noted previously, Defendants Tilton, Patriarch Partners, Zohar II and the John Doe Defendants created Zohar Waterworks in August 2005, negotiated the Building Leases and Equipment Lease on Zohar Waterworks' behalf, and have been Zohar Waterworks' sole source of funding since its creation.

79.     At all relevant times, Tilton and Harrington have been the only members of Zohar Waterworks' Board of Directors.

80.     At all relevant times, Tilton, through Patriarch Partners, Zohar II and/or the John Doe Defendants, held all or substantially all of Zohar Waterworks' equity.

81.     At all relevant times, Defendants Tilton, Patriarch Partners, Zohar II, the John Doe Defendants, Patriarch Management and Harrington have completely controlled and dominated the senior management of Zohar Waterworks, including hiring employees of Defendants' consultants to serve as CFO, by firing at least two CEOs, and by inserting Harrington as interim CEO on at least two occasions.

21

D9241 - H55

82.  At all relevant times, Defendants Tilton, Patriarch Partners, Zohar II, the John Doe Defendants, Patriarch Management and Harrington have made the decisions on the finances and capital expenditures of Zohar Waterworks.  Indeed, Harrington was responsible for any capital expenditures and was responsible for making decisions on any major repairs to the Premises.

83.  Throughout the course of the litigation with Plaintiffs, Tilton and Harrington directed and controlled Zohar Waterworks' litigation strategy, such as hiring counsel that had previously represented Patriarch Partners and Tilton in other litigation, making all decisions on mediation and settlement, and overseeing Zohar Waterworks' defense in that case.

84.  Indeed, perhaps the most compelling evidence of the extent of Defendants' control and domination of Zohar Waterworks arises out of the curious timing of Zohar Waterworks' bankruptcy in April 2009.  According to the filings in that case, the reason for the bankruptcy was Plaintiffs' imminent judgment and collection efforts against Zohar Waterworks that allegedly would shut down Zohar Waterworks' operations.  However, notwithstanding Zohar Waterworks' fear that a substantial judgment was imminent in March 2009, that bankruptcy filing was postponed until April 1, 2009.  Upon information and belief, Zohar Waterworks' bankruptcy was postponed to preserve the security interests of Patriarch Partners, Zohar II and/or the John Doe Defendants in the financing for the operations of Zohar Waterworks' overseas affiliates, security interests which could only be perfected by delaying any bankruptcy filing until after March 31, 2009.  Simply put, Zohar Waterworks' bankruptcy filing date was delayed by Tilton, Patriarch Partners and Zohar II to protect

D9241 - H56

Defendants' security interests notwithstanding the substantial risk posed to Zohar Waterworks' operations by the impending judgment.

85.  Tilton, Patriarch Partners and Zohar II also schemed to use the Zohar Waterworks bankruptcy process to cause claims of Zohar Waterworks and against them to be transferred to them or to entities they control.  Notwithstanding these efforts by Tilton, Patriarch Partners and Zohar II to "game" the bankruptcy process to preserve their secured interests, gain control over potential claims adverse to their interests, and frustrate Plaintiffs' imminent judgment against Zohar Waterworks, the efforts of Tilton, Patriarch Partners and Zohar II to avoid liability for their conduct was rejected when the Honorable Brendan L. Shannon of the U.S. Bankruptcy Court for the District of Delaware effectively ruled that any claims against Tilton, Patriarch Partners, Zohar II, the John Doe Defendants and any related parties, including all Defendants, such as the claims in this Complaint, would not be released or assigned and are preserved.

## COUNT ONE – INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS AGAINST DEFENDANTS TILTON, PATRIARCH PARTNERS, PATRIARCH MANAGEMENT, ZOHAR II, HARRINGTON, AND OTHER JOHN DOE DEFENDANTS

86.  Plaintiffs reallege and incorporate herein paragraphs 1 through 85 as fully as if completely rewritten herein.

87.  The Equipment Lease and the Building Leases were at all times in existence and enforceable contracts supported by consideration.  In fact, the Leases were declared valid and enforceable in the prior litigation between Zohar Waterworks and Plaintiffs.

D9241 – H57

88.     At all relevant times, Defendants Tilton, Patriarch Partners, Patriarch Management, Zohar II, Harrington and/or the John Doe Defendants had actual knowledge of the terms and conditions of the Equipment Lease and the Building Leases.

89.     Defendants Tilton, Patriarch Partners, Patriarch Management, Zohar II, the John Doe Defendants and Harrington knowingly and maliciously interfered with and prevented Zohar Waterworks from performing its obligations under the Equipment Lease and Building Leases by controlling Zohar Waterworks' actions and directing Zohar Waterworks not to perform its obligations under those Leases when those Defendants knew that such action would result in direct violation and material breach of those Leases.

90.     Defendants Tilton, Patriarch Partners, Patriarch Management, Zohar II, the John Doe Defendants and Harrington interfered with and prevented Zohar Waterworks' performance of the Equipment Lease and Building Leases by ordering Zohar Waterworks not to perform under the three Leases, including, but not limited to: (a) directing Zohar Waterworks not to perform its obligations under Paragraph 7.1 and 7.4 of the Building Leases to repair and restore the Premises; (b) directing Zohar Waterworks not to perform its obligations under Paragraph 26 of the Equipment Lease to reasonably cooperate with the February 2007 auction; and (c) directing Zohar Waterworks to improperly and unlawfully convert and steal Plaintiffs' Equipment and transport it to Mexico in violation of Paragraphs 8 and 26 of the Equipment Lease.

91.     Specifically, Defendants Tilton, Patriarch Partners, Patriarch Management, Zohar II, the John Doe Defendants and Harrington have utilized their control over Zohar

24

D9241 - H58

Waterworks to further their interests rather than encourage Zohar Waterworks to meet its responsibilities and obligations under the Leases with Plaintiffs.

92.    In directing Zohar Waterworks not to perform under the three Leases to gain an advantage over Plaintiffs, Defendants Tilton, Patriarch Partners, Patriarch Management, Zohar II, the John Doe Defendants and Harrington specifically intended to harm Plaintiffs and interfere with the three Leases.

93.    Defendants Tilton, Patriarch Partners, Patriarch Management, Zohar II, the John Doe Defendants and Harrington had no lawful or legitimate justification for their procurement of Zohar Waterworks' breach of the Equipment Lease and the Building Leases

94.    Plaintiffs have suffered and will continue to suffer actual damages, in an amount exceeding $7,000,000, as a direct and proximate result of the improper and unlawful conduct of Defendants Tilton, Patriarch Partners, Patriarch Management, Zohar II, the John Doe Defendants and Harrington.

95.    In interfering with the three Leases, Defendants Tilton, Patriarch Partners, Patriarch Management, Zohar II, the John Doe Defendants and Harrington acted knowingly, intentionally, with malice, and in conscious disregard of Plaintiffs' rights.    Accordingly, Plaintiffs are entitled to recover punitive damages in an amount not less than $25,000,000.

## COUNT TWO – FRAUD AGAINST DEFENDANTS TILTON AND PATRIARCH PARTNERS

96.    Plaintiffs reallege and incorporate herein paragraphs 1 through 95 as fully as if completely rewritten herein.

97.    At the time that the Building Leases were being negotiated by Tilton and Patriarch Partners, Tilton and Patriarch Partners knew that Zohar Waterworks would not be

D9241 – H59

remaining in the Premises as a long-term tenant and that Zohar Waterworks would not commit the substantial resources necessary to maintain and repair the Premises.

98. Nevertheless, Tilton and Patriarch Partners falsely and knowingly represented their intention to permit Zohar Waterworks to repair and maintain the Premises, as reflected in Paragraphs 7.1(a), 7.1(b) and 7.4(c)of the Building Leases.

99. Similarly, at this same time, when they were negotiating the Equipment Lease, Tilton and Patriarch Partners knew that Zohar Waterworks' operations could not afford to remain in Columbus and that they would instead would be moving Zohar Waterworks' operations to Mexico.

100. Tilton and Patriarch Partners knew that Zohar Waterworks could not survive without the Equipment, much of which was specifically designed for Zohar Waterworks' operations.

101. At the time of the negotiations of the Equipment Lease, Tilton and Patriarch Partners knew that Plaintiff MA Equipment insisted on provisions requiring, among other things, that the Equipment not be moved without Plaintiff MA Equipment's written consent (Paragraph 8 of the Equipment Lease) and that, at the termination of the Equipment Lease, Zohar Waterworks would pay in excess of $3.5 million to purchase that Equipment (Paragraph 25 of the Equipment Lease). However, the Equipment had been poorly maintained and was in fact valued at significantly less than that amount.

102. At the time of the negotiation and execution of the Equipment Lease, Tilton and Patriarch Partners had no intention of permitting Zohar Waterworks to perform those and other provisions of the Equipment Lease. To the contrary, upon information and belief,

26

D9241 – H60

Tilton and Patriarch Partners intended to direct Zohar Waterworks to move its operations to Mexico and to surreptitiously and systematically remove Plaintiff MA Equipment's Equipment without its consent, to ensure that such move could not be disrupted.  Once that Equipment was moved to Mexico, Tilton and Patriarch Partners then would be able to renegotiate the Equipment Lease's terms, including, but not limited to, the buy out amount for that Equipment.

103.    Accordingly, Tilton and Patriarch Partners had no intention of permitting Zohar Waterworks to perform these critical terms of the Building Leases and the Equipment Lease.

104.    Accordingly, the representations outlined above and included in the Building Leases and the Equipment Lease were false at the time that they were made and Tilton and Patriarch Partners knew that they were false at the time that they were made.

105.    Those representations were material to both the Building Leases and the Equipment Leases.

106.    Tilton and Patriarch Partners' misrepresentations were made with the intent of misleading Plaintiffs into relying upon them so that Tilton and Patriarch Partners could complete their deal and turn around the operations of Zohar Waterworks.

107.    Plaintiffs were justified in relying on the representations of Tilton and Patriarch Partners.

108.    As noted above, Plaintiffs have suffered substantial damages proximately resulting from their justifiable reliance on Tilton and Patriarch Partners' misrepresentations,

D9241 — H61

including, but not limited, to compensatory damages in excess of $7,000,000, and are entitled

to punitive damages not less than $25,000,000 against Tilton and Patriarch Partners.

## COUNT THREE – SETTING ASIDE THE CORPORATE FORM AND BREACH OF CONTRACT AGAINST DEFENDANTS TILTON, PATRIARCH PARTNERS, ZOHAR II AND JOHN DOE DEFENDANTS

109.    Plaintiffs reallege and incorporate herein paragraphs 1 through 108 as fully as

if completely rewritten herein.

110.    Upon information and belief, Tilton, Patriarch Partners, Zohar II and the

John Doe Defendants are the sole funding source for Zohar Waterworks.

111.    Defendants Tilton, Patriarch Partners, Zohar II and the John Doe Defendants

have been conducting, managing, and controlling the affairs of Zohar Waterworks for their

own personal benefit.

112.    At all relevant times herein, Defendants Tilton, Patriarch Partners, Zohar II,

and the John Doe Defendants exercised total dominion and control over Zohar Waterworks,

and Defendants Tilton, Patriarch Partners, Zohar II, and the John Doe Defendants

completely control the funding and expenditures of Zohar Waterworks.  This dominion and

control was so absolute and complete that Zohar Waterworks had no separate mind, will or

existence of its own.

113.    Defendants Tilton, Patriarch Partners, Zohar II and the John Doe Defendants

so intermingled their involvement and financial affairs with Zohar Waterworks that Zohar

Waterworks became their alter ego.

114.    In connection with their abuse of the corporate form of Zohar Waterworks

and to improperly and unlawfully advance their own interests, Defendants Tilton, Patriarch

Partners, Zohar II and the John Doe Defendants have exercised their control over Zohar

28

D9241 - H62

Waterworks in such a manner as to commit numerous unlawful and illegal acts against Plaintiffs, including, but limited to, fraud, deceit, conversion, theft, threats and economic duress as outlined above.

115.    Defendants Tilton, Patriarch Partners, Zohar II and the John Doe Defendants, through their actions and conduct outlined above, have knowingly and maliciously misused the corporate form to defraud and unjustly damage Plaintiffs in connection with the transactions and conduct described above, and therefore the corporate form of Zohar Waterworks should be set aside, with Defendants Tilton, Patriarch Partners, Zohar II and/or the John Doe Defendants being held jointly and severally liable for the damages suffered by Plaintiffs for Zohar Waterworks' material breach of the Equipment Lease and the Building Leases in an amount not less than $7,000,000.00.

## COUNT FOUR – CIVIL CONSPIRACY AGAINST ALL DEFENDANTS

116.    Plaintiffs reallege and incorporate herein paragraphs 1 through 115 as fully as if completely rewritten herein.

117.    Defendants Tilton, Patriarch Partners, Patriarch Management, Zohar II, the John Doe Defendants and Harrington agreed, planned, and conspired to commit illegal acts and have taken acts in furtherance of the conspiracy, including breach of Zohar Waterworks' contractual duties to Plaintiffs.

118.    Defendants Tilton, Patriarch Partners, Patriarch Management, Zohar II, the John Doe Defendants and Harrington's actions have caused and will continue to cause Plaintiffs to suffer actual damages in an amount exceeding $7,000,000.00.

119.    Defendants Tilton, Patriarch Partners, Patriarch Management, Zohar II, the John Doe Defendants and Harrington have acted knowingly, intentionally, with malice, and

29

D9241 — H63

in conscious disregard of Plaintiffs' rights. Accordingly, Plaintiffs are entitled to recover punitive damages in an amount not less than $25,000,000.00.

**WHEREFORE,** Plaintiffs MA Equipment Leasing I LLC and MA 265 North Hamilton Road LLC demand judgment as follows:

A)     That Defendants Tilton, Patriarch Partners, Patriarch Management, Zohar II, and Harrington, jointly and severally, be ordered to pay compensatory damages in excess of $7,000,000;

B)     That Plaintiffs be awarded punitive damages not less than $25,000,000;

C)     That Plaintiffs be awarded all attorneys' fees, prejudgment interest, expenses and costs incurred herein; and

D)     That Plaintiffs be granted such other and further relief as the Court deems appropriate.

Respectfully submitted,

Marc J. Kessler (0059236)
John F. Marsh   (0065345)
Sara A. Stahley (0081123)
Hahn Loeser + Parks, LLP
65 East State Street, Suite 1400
Columbus, Ohio  43215
(614) 233-5102
(614) 233-5107 (facsimile)
mkessler@hahnlaw.com
jmarsh@hahnlaw.com
sstahley@hahnlaw.com
*Attorneys for Plaintiffs MA Equipment Leasing I LLC and MA 265 North Hamilton Road LLC*

D9241 - H64

## JURY DEMAND

Plaintiffs demand trial by jury of the maximum number of jurors allowed, on all issues so triable.

*An Attorney for Plaintiffs*